IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM


UNITED STATES OF AMERICA,    ) Criminal Case
                                 ) Nos. CR 07-00111
                                 ) and CR 08-00013
                Plaintiff,  ) Date:  6/4/2009
                                 ) Time:  9:49 a.m.
                                 )
        vs.                      )
                                 )
JOSHUA J.C. ULLOA,          )
                                 )
                Defendant.  )


TRANSCRIPT OF PROCEEDINGS BEFORE

THE HONORABLE FRANCES TYDINGCO-GATEWOOD

Chief Judge


**Sentencing**


Proceedings recorded by digital recording, transcript produced by computer.

APPEARANCES


Appearing on behalf of plaintiff:


**UNITED STATES ATTORNEY'S OFFICE**
**BY: ROSETTA SAN NICOLAS, AUSA**
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam




Appearing on behalf of defendant:


**THE VAN DE VELD LAW OFFICES**
**BY: CURTIS VAN DE VELD, ESQ.**
Second Floor, Historical Building
123 Hernan Cortes Avenue
Hagatna, Guam



ALSO PRESENT:

Agent Thanh Churchin, DEA
Stephen Guilliott, U.S. Probation

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GOVERNMENT WITNESS: |  |  |  |  |
| Agt. Thanh Churchin | 20 | 24 | 27 | 31 |
| MOTION: Ms. San Nicolas | 07 Granted | 08 |  |  |
| MOTION: Ms. San Nicolas | 10 Granted | 10 |  |  |

| Government's Exhibit: | Marked |
|---|---|
| 1-Photographs | 27 |

1          **Thursday, June 4, 2009; at 9:49 a.m.; Hagatna, Guam**

2                                    * * *

3              THE COURT:  Criminal case number 07-00111 and

4     case number 08-00013; *United States of America versus Joshua*

5     *J.C. Ulloa*; sentencing.

6              Counsel, please state your appearances.

7              MS. SAN NICOLAS:  Good morning, Your Honor,

8     Rosetta San Nicolas for the government.  To my left is Special

9     Agent Thanh Churchin with the DEA.

10             THE COURT:  Good morning, Agent Churchin and

11    Ms. San Nicolas.

12             MR. VAN DE VELD:  Good morning, Your Honor,

13    Curtis Van de veld on behalf of the defendant, Joshua J.C.

14    Ulloa, who is seated to my immediate right.

15             THE COURT:  Good morning, Mr. Van de veld.  Did

16    you just get out of Superior Court?

17             MR. VAN DE VELD:  Yes, Your Honor.

18             THE COURT:  We ready to proceed to sentencing at

19    this time?

20             MR. VAN DE VELD:  Your Honor, I would -- I've

21    reviewed the presentence report materials with Mr. Ulloa but

22    it has been several months since I last went over them with

23    him and I had hoped to get out to see him to refresh his

24    recollection about the sentencing materials but did not get a

25    chance to do so, and rather than take up minutes of the

1   court's time, I would like to ask for maybe a one-week

2   continuance to be able to refresh his recollection.

3           THE COURT:  Well, Mr. Van de veld, this case has

4   been pending sentencing.  I mean, why haven't you seen your

5   client prior to today and -- number one; and number two, why

6   haven't you filed a motion for continuance before your client

7   was brought here by the U.S. Marshals and before the agent

8   came here and before this court?

9           MR. VAN DE VELD:  Because my staff miscalendared

10  the sentencing hearing instead of for the 5th, for the 9th,

11  and so I attempted to see him before the 9th.

12          THE COURT:  Well, as I understand it, you have

13  filed no objections to the presentence report.

14          MR. VAN DE VELD:  No objections.  And I did

15  review the presentence report with him when it came out, which

16  was as far back as January, but it's been several months.  I

17  wanted to make sure that he is comfortable and remembers.

18          THE COURT:  Well, do you need twenty minutes to

19  go over this with him?

20          MR. VAN DE VELD:  Ten minutes, Your Honor.

21          THE COURT:  Ten minutes.  All right.  I'll give

22  you a ten-minute continuance, then and we'll proceed forward.

23          MR. VAN DE VELD:  Thank you.

24          THE COURT:  All right.  Ten-minute recess.

25          (Recess taken.)

```
1                    (Back on the record.)

2                    THE COURT:  Please be seated.  Call back the

3       case, Gina.

4                    THE CLERK:  Criminal case 07-00111 and case

5       number 08-00013; United States of America versus Joshua J.C.

6       Ulloa.

7                    Counsel, please state your appearance.

8                    MS. SAN NICOLAS:  Good morning, Your Honor,

9       Rosetta San Nicolas for the government.  To my left is Special

10      Agent Thanh Churchin with DEA.

11                   MR. VAN DE VELD:  Morning, Your Honor, Curtis Van

12      de veld on behalf of the defendant, Joshua J.C. Ulloa, who is

13      to my immediate right.

14                   THE COURT:  Mr. Van de veld, did you have enough

15      time to refresh your client about the presentence report?

16                   MR. VAN DE VELD:  Yes, and to go over the few

17      changes that occurred in the intervening time because of the

18      continuances that have occurred in the case, some people

19      (inaudible) -- with that information.

20                   THE COURT:  All right.  You ready to proceed at

21      this time?

22                   MR. VAN DE VELD:  We're ready to proceed, Your

23      Honor.

24                   THE COURT:  Make sure next time we don't -- I --

25      you know, the Court doesn't appreciate this last-minute
```

1    request for continuance.  To me, it doesn't justify --

2                    MR. VAN DE VELD:  I understand.  Thank you, Your

3    Honor.

4                    THE COURT:  Proceed at this time.  Mr. Ulloa,

5    this is the time set for imposition of sentence upon you in

6    case number -- and you have two criminal cases.  As will you

7    recall, you plead guilty to CR 7-111 and CR 8-13, or is that

8    CR 11?

9                    MR. VAN DE VELD:  It's --

10                    THE COURT:  111.

11                    MR. VAN DE VELD:  It's 08-111.

12                    THE COURT:  Okay, that's right.  So CR 111.

13    CR 7-111 and CR 8-13.  On March 11, 2008, you appeared before

14    the Court and entered a guilty plea to drug user in possession

15    of firearm, and the second indictment you pled to was

16    conspiracy to manufacture methamphetamine.  The Court has

17    reviewed the presentence report and plea agreement --

18    agreements, and the Court has accepted your guilty plea and

19    adjudicates you guilty of these charges.  As I understand it,

20    the United States attorney has no objections to the

21    presentence report; is that correct?

22                    MS. SAN NICOLAS:  No, Your Honor.  And also for

23    the record, we would at this time move to have both of these

24    cases unsealed, 07-00111 as well as 08-00013, and we have no

25    objection to the PSR.

1          THE COURT:  Al right.  No objections to the PSR.

2   Do you have any objections?  As I see it, you have none.

3          MR. VAN DE VELD:  We have no objections to the

4   PSR.  My understanding is the government tends to move the

5   Court for an additional one level decrease in the offense

6   level based upon acceptance of responsibility.

7          THE COURT:  All right.  Well, okay, that's -- she

8   can make her motion in a while, but with regard to objections,

9   there are none?

10          MR. VAN DE VELD:  There are no objections, Your

11   Honor.

12          THE COURT:  All right.  Very well.  No

13   objections.  The Court will unseal all the matters in this

14   case so that everything regarding the first charge and -- I'm

15   sorry, Count 1, and count -- well, both Counts 1 in the

16   separate indictments are now public record.

17          Mr. Van de veld, now you've indicated to the

18   Court that you had an opportunity to review the presentence

19   report with your client a couple months ago and you have now

20   refreshed your memory and his memory on some matters of the

21   court.

22          And I would like to ask Mr. Ulloa, is that your

23   understanding that you had an opportunity to review the

24   presentence report with your attorney.

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And you discussed earlier today prior

2  to sentencing any concerns that your attorney may have with

3  regard to refreshing your memory and his memory about the

4  presentence report?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  And are you ready to

7  proceed at this time?

8          THE DEFENDANT:  (Inaudible.)

9          THE COURT:  Mr. Van de veld, you are ready as

10  well?

11          MR. VAN DE VELD:  That is correct, Your Honor.

12          THE COURT:  Okay.  Mr. Guilliott, our chief

13  probation officer -- or I'm sorry, probation officer, can you

14  explain to us the calculations on the sentencing exposure

15  range for Mr. Ulloa?

16          PROBATION OFFICER:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          PROBATION OFFICER:  Each separate case was put in

19  separate groups.  Case number 07-111 was put into Group 1.

20  That's the fire -- drug user in possession of firearm.  The

21  base offense level of that offense is 14, and there's no other

22  adjustments.  So the adjusted level for Group 1 is 14.  Group

23  2 consists of case number 08-13, conspiracy to manufacture

24  methamphetamine.  The base offense level for that offense is

25  16.  Defendant's base level is increased to a level 30, since

1  the manufacture of methamphetamine created a substantial risk

2  of harm to the five minors involved in this case.  The

3  adjusted offense level is 30.

4          THE COURT:  And the five minors include three of

5  his own children?

6          PROBATION OFFICER:  Correct, Your Honor.

7          THE COURT:  Okay.

8          PROBATION OFFICER:  There is no increase in the

9  base offense level since group -- the highest offense level,

10 which is Group 2, is more than nine levels less serious than

11 Group 1.  The highest of the adjusted offense level is 30.

12 The combined adjusted offense level is 30.  The defendant

13 currently receives a two level decrease for acceptance of

14 responsibility.

15          And does the government want a motion at this

16 time to -- for the additional one level decrease?

17          MS. SAN NICOLAS:  Yes, Your Honor.  Your Honor,

18 at this time, we move for a one level decrease pursuant to

19 3E1.1 of the sentencing guidelines.

20          THE COURT:  And so instead of being an offense

21 level of 28, it will now be 27?

22          PROBATION OFFICER:  Yes, Your Honor.

23          THE COURT:  So the defendant will face how many

24 months of imprisonment?

25          PROBATION OFFICER:  For a total offense level of

27 and a criminal history category of 3, for case number
07-111, he has a statutory imprisonment range of ten years, a
guideline imprisonment range of 87 to 108 months.  The
statutory penalties for 08-13 is a 5-year minimum to 40-year
maximum sentence and a guideline imprisonment range of 87 to
108 months.  The guideline fine range for both offenses is
$12,500 to $125,000.  The recommended sentence in this case is
97 months imprisonment, three years supervised release in case
number 07-111 and 97 months imprisonment and four years
supervised release in case number 08-13.  Both cases shall be
served concurrently.

          THE COURT:  And then the criminal history
category, can you explain that?

          PROBATION OFFICER:  He has a criminal history
category of 3, Your Honor.

          THE COURT:  Mm-hmm.  And the reason?  Can you
just explain his criminal past?

          PROBATION OFFICER:  Yes.  He has adult criminal
convictions dating back from October 14, 1999.  He has a DUI
for that offense, which he received three criminal history
points.  He has another DUI case on Guam --

          THE COURT:  I'm sorry, the first DUI case, this
is the one where he was convicted in Louisiana?

          PROBATION OFFICER:  Yes, Your Honor.  He pled
guilty, sentenced to six months probation, two days in jail;

```
1   he had absconded and a warrant of arrest was issued in that

2   case.

3              THE COURT:  And so it was this case while he was

4   on -- while his warrant was active because he absconded that

5   he committed these other crimes?

6              PROBATION OFFICER:  Yes.

7              THE COURT:  That are before the Court?

8              PROBATION OFFICER:  Yes; correct.

9              THE COURT:  And that's why his criminal history

10  category is higher?

11             PROBATION OFFICER:  Yes; by two points.

12             THE COURT:  Okay.

13             PROBATION OFFICER:  Then he receives additional

14  criminal history category points for a DUI case in December

15  17, 2003.  He has a total criminal history category of 3 for

16  the four criminal history points.

17             THE COURT:  All right.  So the defendant then has

18  a criminal history category of 3?

19             PROBATION OFFICER:  Yes, Your Honor.

20             THE COURT:  You're indicating, because of his two

21  priors?

22             PROBATION OFFICER:  Yes, Your Honor.

23             THE COURT:  Then he also has pending cases now.

24             PROBATION OFFICER:  Yes, yes.

25             THE COURT:  With the Superior Court of Guam?
```

```
 1                    PROBATION OFFICER:  Yes.

 2                    THE COURT:  Okay.  And can you tell us how many

 3      pending cases does he have?

 4                    PROBATION OFFICER:  He has one forgery case, the

 5      child abuse case; those are the two pending cases.

 6                    THE COURT:  The child abuse case is the one that

 7      -- it's part of this case, right?

 8                    PROBATION OFFICER:  Yes, Your Honor.

 9                    THE COURT:  So it's part of the -- when the

10      police raided the home and then they found the children --

11                    PROBATION OFFICER:  Yes.

12                    THE COURT:  -- sleeping and there were drug

13      activities going on?

14                    PROBATION OFFICER:  Correct.

15                    THE COURT:  Forgery, child abuse.  What else?

16                    PROBATION OFFICER:  Then he has other criminal

17      conduct: a robbery case that was dismissed, and then other

18      arrests, a terrorizing case in June of 2002 and a

19      manufacturing of marijuana in 2003, but prosecution was

20      declined in both cases.

21                    THE COURT:  Okay.  So he has three cases that

22      essentially are the prosecution has been declined or the case

23      has been dismissed?

24                    PROBATION OFFICER:  Yes, Your Honor.

25                    THE COURT:  But there's two pending cases now?
```

1          PROBATION OFFICER:  Yes, Your Honor.

2          THE COURT:  And he has two priors?

3          PROBATION OFFICER:  Yes, Your Honor.

4          THE COURT:  All right.  And why are you

5    recommending 97 months from probation?

6          PROBATION OFFICER:  Eighty-seven months.

7          THE COURT:  Oh, you said 97.  You meant 87?  You

8    initially said -- I think you wanted 97 because that was the

9    original --

10         PROBATION OFFICER:  Yes, yes.  That was -- they

11   were before the application of 3E1.1(b).  Yeah, I recommend

12   the minimum at offense level 28, so the minimum at offense

13   level 27 is 87.

14         THE COURT:  Okay, so you're recommending 87

15   months as opposed to 97.  And your reason for 87 months is?

16         PROBATION OFFICER:  In comparison to his

17   co-defendants, this defendant is more culpable.  His

18   co-defendant, Christine Duenas, received 57 months; Jonathan

19   Ninete received 71 months.  So --

20         THE COURT:  Christine Duenas is the mother of the

21   children?  His three children?

22         PROBATION OFFICER:  I believe.  And his former

23   girlfriend.

24         THE COURT:  Okay.  And former girlfriend?  And so

25   she has received 57 months.  Jonathan Ninete, who I also

1   sentenced, received what, 71 months?

2              PROBATION OFFICER:  Seventy-one months; yes.

3              THE COURT:  And then Vanessa Tenorio and

4   Christopher Grantham and Kelly Francisco's case have not been

5   sentenced?

6              PROBATION OFFICER:  Correct.

7              THE COURT:  And then Johnnie Fortner, from a

8   different raid, had received six months?

9              PROBATION OFFICER:  Right; as it relates --

10             THE COURT:  All right.  Very well.  All right.

11  Any other reason?

12             PROBATION OFFICER:  No, Your Honor.

13             THE COURT:  Can I hear from the prosecution then.

14  Ms. San Nicolas, if you can come up to the podium.  Your

15  recommendation --

16             MS. SAN NICOLAS:  Thank you, Your Honor.

17             THE COURT:  -- for this defendant's sentence.

18  First of all, do you agree with the calculations as enunciated

19  by the U.S. Probation Office?

20             MS. SAN NICOLAS:  Agree, Your Honor.

21             THE COURT:  All right.

22             MS. SAN NICOLAS:  Agree to all the calculations.

23             THE COURT:  So you agree that the defendant right

24  now, under the sentencing guidelines, faces 87 months to 108

25  months sentence?

1        MS. SAN NICOLAS:  Yes, we do agree, Your Honor.

2   Level 27 criminal history category 3, Your Honor.

3        THE COURT:  You may proceed.

4        MS. SAN NICOLAS:  Your Honor, at this time, the

5   government recommends the defendant receive 96 months.  The

6   range is 87 to 108.  This is approximately seven years and

7   three months to nine years.  The government believes that 96

8   months would be appropriate for this defendant.  The reason,

9   Your Honor, is because we have two cases:  We have the first

10  case is the defendant is a drug user in possession of a

11  firearm.  And as this court is very familiar, this incident

12  arose out of a traffic pullover of the defendant in the Dairy

13  Road area, Dairy Road in Mangilao.  The defendant was a driver

14  of the vehicle; this was a Mazda Miyata.  The passengers were

15  Johnnie Fortner and Christine Duenas.  We would note, Your

16  Honor, that the defendant has received leniency and has not

17  been prosecuted for that offense; however, he must contend

18  with the present case that involves the second incident of a

19  violation of 21 U.S.C. 841 --

20       THE COURT:  And why the United States Attorney's

21  has decided not to prosecute him for the other offense [sic]?

22       MS. SAN NICOLAS:  Your Honor, this defendant,

23  when he was arrested in 2007, initially agreed to cooperate

24  and the Court released the defendant.  After he was

25  cooperating, he ended up getting in more trouble.  We found

out later that his activity had continued.  Specifically, he
was seen at the -- he was seen purchasing materials that
related to the production of methamphetamine.  He was also,
Your Honor, pursuant to the logs at the pharmacies, had
actually purchased methamphetamine.  The officers were -- had
wind of the activities and were looking for Christopher
Grantham at the Consolacion Street, Asan residence, entered
the home, the defendant answered the door, along with
Christine Duenas, and in that home they found Christopher
Grantham, Jonathan Ninete and the children, to include the
defendant's three children, the -- his biological children,
the remaining two children and a 17-year-old minor.  He was
given an opportunity to reduce that sentence and that did not
pan out.  He continued with his criminal lifestyle.

          Your Honor, we requested that the Court sentence
the defendant to the mid-range still within the applicable
guidelines of 96 months.  This facts and circumstances are
that this defendant had the firearm in his home above the
refrigerator.  When he did inform the police that he had the
firearm, the police searched and found the firearm was hidden
outside by the co-defendant, Jonathan Ninete.  They also noted
when they entered the home the strong odor of chemical
substances and learned that this was the place that a
methamphetamine lab was -- methamphetamine was being produced.

          So we have a gun with bullets, we have six

1 children in a home and we have the manufacturing

2 methamphetamine as the nature and circumstances. Also, Your

3 Honor, this court must render a decision that reflects the

4 seriousness of the offense and we believe that a stiff penalty

5 of 96 months would reflect that there is no tolerance for

6 manufacturing methamphetamine and certainly while children are

7 in the home.

8 Another goal is to deter this type of criminal

9 behavior. This court is familiar with methamphetamine and the

10 risk of production. There is a risk of explosion, inhalation,

11 toxins and poisons. Also, Your Honor, the Court must protect

12 the public from further crimes and this defendant must account

13 for his continued criminal behavior by buying the

14 pseudoephedrine and being spotted at the pool store purchasing

15 PH strips.

16 Your Honor, this defendant will not languish in

17 jail. He will receive -- he can receive the benefit of drug

18 counseling, he can receive educational opportunities that may

19 not have been available to him. And so, Your Honor, we ask

20 that this defendant receive the 96 months. An additional

21 reason is, Your Honor, he was committing his home, the home

22 that was given to him from the community, from GHURA, to be

23 used for manufacturing methamphetamine. And the fee for

24 letting his home be used was he would get a cut of the

25 methamphetamine that was produced. This is certainly a

1    defendant that (incomprehensible) a 96 months term of

2    incarceration and we recommend that he receive 96 months of

3    incarceration.  The co-defendants have received different

4    sentences for obviously different reasons.  Christine Duenas,

5    sentence of 57 months, is approximately 4.8 years in jail;

6    co-defendant Jonathan Ninete received a 71-month imprisonment.

7    Sentence was also enhanced because of the danger that this

8    action produced to the children that were in the home ranging

9    in ages from one to nine and then a 17-year-old minor who is

10   the girlfriend of Jonathan Ninete.  As the Court has noted,

11   Vanessa Tenorio's sentencing is pending.  Also Christopher

12   Grantham's sentencing is pending; Kelly Francisco's sentencing

13   is scheduled for July 14, 2009.

14            Your Honor, we request the defendant receive a 96

15   month term of incarceration.  If the Court has any questions,

16   Special Agent Thanh Churchin can clarify for the record, if

17   the Court wishes, the location of the chemicals that were

18   found in the home, the existence of a burn pile, as well as

19   any other facts pertaining to either the arrest of the

20   defendant in 2007 and the discovery of the clandestine

21   methamphetamine lab at his home.  We submit, Your Honor.

22   Thank you.

23            THE COURT:  All right.  Why don't you have Agent

24   Churchin take the stand and you can ask him those questions,

25   Ms. San Nicolas.  Agent Churchin, if you can be sworn in by

1    the clerk.

2                          THANH CHURCHIN,

3    called as a witness on behalf of the plaintiff, having first

4    been duly sworn, was examined and testified as follows:

5                 THE CLERK:  State your full name.  Spell your

6    last name for the record.

7                 THE WITNESS:  Thanh Churchin.  Last name is

8    C-H-U-R-C-H-I-N.

9

10                      DIRECT EXAMINATION

11   BY MS. SAN NICOLAS:

12       Q.   Good morning, Special Agent Churchin.  Can you tell

13   us where you work?

14       A.   I work with the Drug Enforcement Administration here

15   on Guam.

16       Q.   And how long have you been on Guam?

17       A.   Approximately two and a half years.

18       Q.   All right.  And how much total experience do you have

19   with DEA?

20       A.   Approximately fourteen years.

21       Q.   Now, sir, I'd like to call your attention to a

22   residence that was the 26 Consolacion Street.  Are you

23   familiar with that residence?

24       A.   Yes, ma'am, I am.

25       Q.   Okay.  And this is a residence of the defendant,

1   Joshua Ulloa and Christine Duenas; correct?

2       A.    That's correct.

3       Q.    Now, did you have an opportunity to actually go to

4   the residence on January 7, 2008?

5       A.    Yes, ma'am, I did.

6       Q.    Can you describe the residence?

7       A.    It's a concrete house, looked like it was fairly

8   maintained.  There was approximately four bedrooms upstairs

9   and it's in the, I guess, Asan -- Asan area.

10      Q.    Okay.  Now, when you entered the home, can you tell

11  us what was the manner that items were stored in the home,

12  items pertaining to the manufacturing of methamphetamine?

13      A.    Our purpose going to that house when we were there on

14  that particular day would be execute a federal search warrant

15  at location.  During the search of the residence, we found

16  various chemicals downstairs in the bathroom and also in the

17  kitchen and we also found other materials upstairs in the

18  bedrooms, and also items relating to the manufacture of

19  crystal methamphetamine in the backyard.

20      Q.    Can you give us an example of some of the items

21  related to the manufacturing of crystal methamphetamine?

22      A.    Some of the ingredients that you would need to

23  process crystal methamphetamine would be like acetone,

24  Denatured alcohol, red phosphorous, which is obtained from a

25  matchbox strikers plate, iodine crystal would be -- get from

1    iodine tincture bottle, which were found in the master bedroom

2    at the residence.

3        Q.   Okay.  And are these items combined together and then

4    heated?

5        A.   Yes, they're combined together and then to

6    manufacture -- once you extract the items that are needed,

7    which is iodine crystal, red phosphorous and pseudoephedrine,

8    these items are combined to manufacture crystal

9    methamphetamine.

10       Q.   Now, was a -- was red phosphorous found in the home?

11       A.   There was a gallon milk jug container that was in the

12   downstairs bathroom that was tested and I believe one of the

13   milk gallons tested positive for iodine, and I believe one of

14   the container was also for red-p, red phosphorous.

15       Q.   And are these the ingredients that are used to

16   manufacture methamphetamine?

17       A.   Yes, ma'am, they are.

18       Q.   Can you, for the record, tell us if there were minors

19   in the home?

20       A.   Upon executions of search warrants there, we

21   encountered children ranging from the age of one to ten and

22   also a minor female of seventeen years old.  Mr. Jonathan

23   Ninete was at the residence, Christine Duenas also was there

24   and Joshua Ulloa, and also previously Mr. Christopher Grantham

25   was arrested from the residence.

1    Q.    Now, how are other chemicals and other substances

2    stored?  Can you tell us the manner how they were stored?

3    A.    They were just underneath the bathroom cabinet or

4    kitchen sink cabinet.  In the bedroom, they were just sitting

5    on the floor.  The iodine tincture was in the closet on top of

6    the shelf, and then in Ninete's bedroom, they were underneath

7    the bed or in a corner of the bedroom.

8    Q.    Were any of the items locked in any kind of storage

9    containers?

10   A.    Not to my knowledge.

11   Q.    Now, when you -- toward the home, did you have an

12   opportunity to see how there was -- how these items were

13   disposed of?  Maybe any of the residue or?

14   A.    There's a burnt trash pile in the backyard and the

15   items that were used to manufacture were actually being burnt

16   or disposed of in the trash pile.

17   Q.    And how long did this manufacturing operation remain

18   in existence?

19   A.    From -- based on my investigation, I think they just

20   started up in December of 2007.

21   Q.    Until around January?

22   A.    Till January, the 7th of 2008.

23   Q.    Now, were there neighbors in the area?

24   A.    Yes, ma'am.

25   Q.    Okay.  Can you tell us if the house was near a

1   street?

2       A.   Yes.  It's on a...

3       Q.   Was the home in a housing area?

4       A.   Yes, it is.

5       Q.   And this would be the GHURA housing area?

6       A.   I'm not sure -- I know it's GHURA housing but I don't

7   know if the other houses in the neighborhood are GHURA

8   housing.

9       Q.   Was there an indication that these containers in the

10  burn pile were actually burned?

11      A.   Yes.

12           (Pause.)

13           MS. SAN NICOLAS:  Your Honor, we have no further

14  questions for this witness.

15           THE COURT:  All right.  Any questions?

16           MR. VAN DE VELD:  I do, Your Honor.

17           THE COURT:  All right.  You may proceed.

18  Cross-examine.  Podium, please.

19                        CROSS-EXAMINATION

20  BY MR. VAN DE VELD:

21      Q.   Agent Churchin, you said you believed that there was

22  red phosphorous material; is it your recollection that is

23  vague that makes you so uncertain?

24      A.   I would have to review the reports of stuff that were

25  seized from the location.  I do remember that there was a

1  gallon milk jug container that contained -- it was tested and

2  tested positive for iodine.  There was also another container

3  that tested positive for meth.

4      Q.   I understand that, Officer Churchin, but I was

5  specifically asking you about the red phosphorous portion.  I

6  wasn't asking you about the iodine.  You said you -- in your

7  response when you were asked by Ms. San Nicolas, you said you

8  believe that there was a container containing red phosphorous

9  but you were -- in making your answer, it seemed as if you

10 were uncertain.  And I'm asking --

11             THE COURT:  Counselor, just ask the question.

12 You don't have to --

13             MR. VAN DE VELD:  I'm asking you --

14             THE COURT:  Ask a specific question instead of

15 arguing with the witness; just ask him.  I mean, if he can't

16 answer it, you know, get right to it.

17     Q.   BY MR. VAN DE VELD: (Continuing) Are you uncertain of

18 that recollection?

19     A.   I believe it was -- I think we have a report here

20 with the lab reports, and if I look back and tell you for

21 sure.

22     Q.   So as you sit there right now, you are uncertain; is

23 that correct?

24     A.   Yes, I am uncertain, but I know that --

25     Q.   Thank you.

1     A.    Okay.

2     Q.    Now, is there anything that you've testified to about

3    today that you didn't know prior to the arrest of the

4    defendant?

5     A.    I don't know what you're asking me, sir.

6     Q.    Well, all of the information that you've testified to

7    about today --

8     A.    Yes.

9     Q.    -- was it known to you by the time the defendant was

10   brought into court and charged in this case?

11    A.    Yes.

12    Q.    Okay.  So there's nothing that you learned after he

13   was charged that leads to your responses today; is that

14   correct?

15    A.    That's correct.

16          MR. VAN DE VELD:  I have no further questions,

17   Your Honor.  I do have an objection to the government's

18   recommendation and --

19          THE COURT:  Okay, we'll get to that in a second.

20   But with regards to the witness, no further questions?

21          MR. VAN DE VELD:  I have no further questions of

22   th witness.

23          THE COURT:  All right.  We'll hold on a second.

24   You may step down.

25          Oh.  Do you have any redirect?

1          THE WITNESS:  Yes.

2          MS. SAN NICOLAS:  If I could, Your Honor.

3          THE COURT:  All right.  If you're marking

4  something, have it marked first, Ms. San Nicolas.

5          MS. SAN NICOLAS:  Yes, Your Honor.

6          THE COURT:  This will be marked as Prosecution

7  Exhibit 1.  Is it just one exhibit or two exhibits?  So it's

8  one exhibit?  Exhibit 1.

9          MR. VAN DE VELD:  Yes, Your Honor.  It already

10  has the No. 8 on it.

11  (Exhibit 1 marked: Photograph.)

12          THE COURT:  It will be 1.  We'll make it proper.

13  Exhibit 1, for sentencing purposes.  All right.

14                     REDIRECT EXAMINATION

15  BY MS. SAN NICOLAS:

16    Q.   Special Agent, could you -- you stated that you would

17  need to refresh your recollection about the red jug and the

18  clear jug?

19    A.   That's correct.

20    Q.   Do you have your report in front of you?

21    A.   Uh --

22          MR. VAN DE VELD:  Your Honor, if the witness is

23  going to be reviewing something other than the exhibits, then

24  I'm entitled to know exactly what it is.

25          THE COURT:  All right.  What are you doing,

1  agent?

2         MR. VAN DE VELD:  He was directed by the question

3  only to look at the exhibits.

4         THE WITNESS:  I was asked about the reports.  I

5  was just looking at the lab reports, Your Honor.

6         THE COURT:  All right.  Do you have copies of

7  those reports, Mr. Van de veld?

8         MR. VAN DE VELD:  Which page is the government

9  discovery he's referring to?

10        THE COURT:  All right.  Which page of discovery?

11        THE WITNESS:  This is -- I don't know if this is

12 part of discovery, Your Honor, but this is the lab report that

13 I received from the lab which I gave to counsel and I believe

14 it was forwarded to Mr. Curtis.

15        THE COURT:  Did you get copies of the lab reports

16 as to what the results were?  If not, you can look at them.

17        MR. VAN DE VELD:  I've received a CD-ROM.

18        THE COURT:  All right.

19        MR. VAN DE VELD:  (Inaudible.)  I don't have the

20 ability to look -- (inaudible).

21        THE COURT:  All right.  Let him look at that

22 briefly then, Mrs. San Nicolas.  He wants to review the lab

23 reports.

24        MR. VAN DE VELD:  He's looking at it in his file.

25 May I step forward to the witness, Your Honor?

```
1              THE COURT:  Witness?  No, no.  Gina, give him --
2    get the reports and let counsel see it.
3              (Pause for counsel to review.)
4              THE COURT:  All right.  Did you have an
5    opportunity to review those?
6              MR. VAN DE VELD:  Yes, Your Honor.  I'm prepared
7    to stipulate that the content of Exhibit 1, the bottom
8    picture, is indicated to be iodine and the report indicates
9    that Exhibit 31 is a noncontrolled substance but doesn't
10   indicate what exactly is the fluid contained within Exhibit
11   31.
12             THE COURT:  All right.  You made proceed, Ms. San
13   Nicolas.  Go ahead.  And if you wish to engage in that
14   stipulation, let me know but go ahead and proceed.
15             MS. SAN NICOLAS:  Your Honor, the -- we do not.
16   I believe this has been incorrectly identified by defense.
17             THE COURT:  All right.  Go ahead.
18             MS. SAN NICOLAS:  -- resolved by a quick
19   question.
20             THE COURT:  All right.
21        Q.   BY MS. SAN NICOLAS: (Continuing) Special Agent
22   Churchin, have you had an opportunity to review the lab
23   results in this case?
24        A.   Yes, I have.
25        Q.   Now, before you -- now, is your recollection
```

1  refreshed?

2      A.    Yes, it is.

3      Q.    Before you is what has been labelled Government's

4  Exhibit 1 in evidence.  Do you have that document?

5      A.    Yes, it's Exhibit 31, Exhibit 32 and Government's

6  Exhibit 1.

7      Q.    Now, you're referring to the number that's been

8  written on a whiteout board when you're getting the 31 and 32?

9      A.    That's correct.

10     Q.    Now, with regard to the reddish-color gallon, what

11 was in that gallon?

12     A.    The reddish gallon is marked as Exhibit 32, that is

13 iodine.

14     Q.    And this was a result of sending the contents to a

15 lab?

16     A.    Yes, that's correct.

17     Q.    Now, as far as the first gallon, the clear gallon,

18 what was inside that gallon?

19     A.    The clear gallon was marked as Exhibit 31.  The lab

20 separated into two substances:  One substance tested for no

21 controlled substance and the other was tested for red -- trace

22 amount of methamphetamine.

23     Q.    Now, where were these gallons found?

24     A.    These gallons were found, I believe, underneath the

25 downstairs bathroom.

1     Q.   And, to clarify, these were not all of the items that

2  were found; is that correct?

3     A.   No.

4     Q.   So there were other -- is it correct to say there

5  were other precursors or materials used in the manufacturing

6  of methamphetamine?

7     A.   Yes, that's correct.

8              MS. SAN NICOLAS:  No further questions, Your

9  Honor.

10             THE COURT:  All right.  Very well.  Anything

11 further?

12             MR. VAN DE VELD:  Just one question.

13                  RECROSS-EXAMINATION

14 BY MR. VAN DE VELD:

15    Q.   Agent Churchin, again, everything that you testified

16 to about today you had knowledge of prior to Mr. Ulloa having

17 been charged; is that correct?

18    A.   That's correct, sir.

19             MR. VAN DE VELD:  Thank you.  Nothing further.

20             THE COURT:  You may step down.  Let me just ask

21 you as well, Agent Churchin, before you step down:  The United

22 States attorney is recommending 97 months imprisonment for

23 Mr. Ulloa; what is your position on that based on the

24 investigation of this case you have conducted?

25             THE WITNESS:  Your Honor, I would agree with U.S.

1  Attorney's Office on the sole part that when we came in

2  contact with Mr. Ulloa back in October, he was given an

3  opportunity to cooperate with us, which he actually -- he

4  decided, yes, he wanted to cooperate; we maintained contact

5  with him briefly and then we -- he stopped contacting us.  And

6  the next thing we know, he was back to assisting with the

7  manufacturing of crystal methamphetamine around December at

8  this residence.

9           THE COURT:  All right.  Thank you.  You may step

10 down.  All right.  May I have Mr. Van de veld, you and your

11 client can come up.  Did you wish to make any arguments and

12 make a statement to the Court and then did your client wish to

13 make a statement to the Court before I pronounce sentence?

14          MR. VAN DE VELD:  Yes, Your Honor, and I do have

15 an objection.  And Your Honor indicated the government

16 recommended 97 --

17          THE COURT:  I'm sorry, 87 -- or 96.  Excuse me;

18 96 months, that's right.

19          MR. VAN DE VELD:  Yes.  The probation officer has

20 recommended 87 months, but the government, by its

21 recommendation, if Your Honor would please take a look at the

22 plea agreement in this case, page 3, lines 17 through 20,

23 paragraph number 5(a).

24          THE COURT:  Okay.  Hold on one second.  Let me

25 get the plea agreement.

```
 1                    (Pause.)

 2                    All right.  Go ahead.  What -- I've got it.

 3                    MR. VAN DE VELD:  Page 3, Your Honor.

 4                    THE COURT:  Page 3, on which one?

 5                    MR. VAN DE VELD:  Lines 18 through 20.

 6                    THE COURT:  This is 08 --

 7                    MR. VAN DE VELD:  Located at paragraph 5(a).

 8                    THE COURT:  Which plea agreement?  There are two.

 9       08-13?

10                    MR. VAN DE VELD:  07-00111.

11                    THE COURT:  07-111, page 3.  Lines what?

12                    MR. VAN DE VELD:  Lines 18 through 20.

13                    THE COURT:  Okay.  And then let's look at CR

14       8-13.  I'm looking at the same thing, line -- page 3?  Page 3,

15       lines 19 through 21.  Okay.  The Court has reviewed that.

16                    Ms. San Nicolas, what's your position on this?

17                    MS. SAN NICOLAS:  Your Honor, as the document

18       states, the government agreed to recommend either the

19       statutory minimum, which in the case of the drug offense is

20       five to forty, or in the case of the felon -- the drug user in

21       possession of a firearm, which is ten years, we agreed to

22       recommend the statutory minimum or the minimum term of

23       incarceration recommended by the sentencing guidelines,

24       whichever is greater, leaving the government open to ask for a

25       mid-range of the sentencing guidelines.
```

1          MR. VAN DE VELD:  And that's not correct, Your

2    Honor, because the statutory minimum is voided by the fact

3    this is his first felony conviction in district court, and

4    therefore, under the provisions of Section 3553(e), as the

5    presentence report indicates, the Court is freed from the

6    statutory maximum -- I mean, statutory minimum.  So that's why

7    it is the sentencing recommendation is 87 months.  And so

8    having been freed from the statutory minimum, the greater is

9    the guideline, and therefore, the recommendation should be

10   consistent with the minimum end of the guideline range, which

11   is what he was promised in his plea agreement.

12          THE COURT:  I'm sorry, I don't -- I'm not sure if

13   I follow that.  The plea agreement says that the prosecutor

14   has to recommend the statutory minimum.  So let's --

15          Ms. San Nicolas, on the statutory minimum for

16   7-111, you can either recommend that statutory minimum, which

17   is not more than five years?  No, I'm sorry.  Ten years.

18          MS. SAN NICOLAS:  Ten years incarceration.

19          THE COURT:  Ten years maximum.  That's ten years

20   maximum, isn't it?  CR7-111?

21          MR. VAN DE VELD:  But Your Honor, that would only

22   be if it actually applies.

23          THE COURT:  Wait.  Let me just talk to the

24   prosecutor first.

25          Ms. San Nicolas?

```
 1                    MS. SAN NICOLAS:  It's ten years maximum, Your
 2        Honor.
 3                    THE COURT:  And what is the statutory minimum?
 4                    MS. SAN NICOLAS:  If I may have a moment?
 5                    THE COURT:  Yeah.  Because the recommendation is
 6        statutory minimum or the minimum term of incarceration
 7        recommended by the sentencing guidelines.
 8                    Let me have Mr. Guilliott.  Go ahead.
 9                    PROBATION OFFICER:  Your Honor, there's no
10        statutory minimum for the firearm.
11                    THE COURT:  There are none.  Okay.  So there's
12        only a statutory maximum?
13                    PROBATION OFFICER:  Correct.
14                    THE COURT:  Of ten years, right?
15                    PROBATION OFFICER:  Yes.
16                    THE COURT:  And then under CR 8-13, there's a
17        minimum term.
18                    PROBATION OFFICER:  It's five years.
19                    THE COURT:  Five years minimum.  So you got that,
20        and then forty years maximum, right?
21                    PROBATION OFFICER:  Yes.
22                    THE COURT:  Now -- and the minimum term of
23        incarceration is, according to what you have told us, is 87
24        months.  That's the minimum term?
25                    PROBATION OFFICER:  Yes, which exceeds the five
```

```
 1    years for minimum.
 2                 THE COURT:  So the question is -- okay, Ms. San
 3    Nicolas, do you understand that now, on the --
 4                 MS. SAN NICOLAS:  I do, Your Honor, and would --
 5    I modify my request, Your Honor.  Request for 87.
 6                 THE COURT:  Okay.
 7                 MS. SAN NICOLAS:  Eighty-seven months.
 8                 THE COURT:  So -- I'm sorry.  So consistent with
 9    what you have entered a guilty plea to, you believe that based
10    on that particular paragraph 5, that the minimum term of
11    incarceration recommended by the sentencing guidelines, which
12    is greater than the minimum term of the statutory requirement,
13    would be what you're recommending, which is 87 months?
14                 MS. SAN NICOLAS:  Yes, Your Honor.
15                 THE COURT:  Okay.
16                 MS. SAN NICOLAS:  And -- thank you, Your Honor.
17                 THE COURT:  All right.  You may proceed.  She's
18    conceded that.
19                 MR. VAN DE VELD:  Thank you, Your Honor.  The
20    recommendation of Probation, I think, takes into consideration
21    all of the aspects of what the government was concerned about
22    and what the probation officer has mentioned --
23                 THE COURT:  Bring the mic a little closer to you,
24    Mr. -- thank you, Mr. Van de veld.
25                 MR. VAN DE VELD:  I'm sorry.  I normally speak
```

1   fairly loudly.  The concerns that the government has and that
2   the Court should have concerning appropriately punishing the
3   defendant are considered by the sentencing guidelines, and
4   particularly because the offense level was increased from
5   sixteen to thirty.  There was a fourteen level increase in the
6   sentencing offense level based upon the fact of -- that the
7   guidelines takes into consideration the concerns that have
8   been addressed.  So -- and of course, he has had the increase
9   relative to his convictions in the criminal history category,
10  having shifted from criminal history category 1 to criminal
11  history category 3.  So all of the concerns that have been
12  mentioned are taken into consideration by either the increase
13  in the offense level or the increase in the criminal history
14  category.  I believe that the sentencing guidelines adequately
15  addresses all of the concerns in making its recommendation to
16  the Court.  The defendant, therefore, has a sentencing
17  guidelines recommendation to the Court from -- which actually
18  exceeds the punishment which has been given to other persons
19  involved in the case.  Again, representing the variance in the
20  facts from those defendants and this defendant.
21          Mr. Ulloa was, at the time of his release in CF
22  07-111, still heavily addicted to the methamphetamine
23  controlled substance and was unable to stay away from that
24  controlled substance.  For that reason, as part of the
25  sentencing of this case, we would ask the Court to order the

defendant undergo the 12-month intensive drug treatment

program provided by BOP in order for him to learn to deal with

future possible incidences of addiction to controlled

substances.  And I believe that he would benefit from the

treatment and we would ask the Court to impose that period.

The defendant is not going to ask the Court for

some greater leniency than the 87 months.  It was the period

of time that he bargained for in his plea agreement with the

government.  This was the recommendation that he asked for

while he, subsequent to having entered his guilty pleas, met

with the DEA and provided as much detailed information as he

could.  He was not utilized for providing substantial

assistance after that; however -- and therefore, has not

gotten the benefit of a motion for substantial assistance

departure, but he was completely candid and provided to the

government information of all of his knowledge of drug

activities.

He has visibly changed in his appearance from the

time that he was arrested and confined.  He has been in prison

now for almost a year and five months and he has visibly

changed in not only his appearance but in his behavior.  And

he has -- he would like to address the Court and tell Your

Honor about how these circumstances have caused him to change.

The period of time that would be imposed under

the sentencing guidelines is not some insignificant amount of

time.  And unlike offenders who are sentenced under the
sentencing guidelines and live in the mainland area of the
United States and are confined in a place which is fairly
close to their home and residence where they have the
opportunity to be visited with some frequency by loved ones,
Mr. Ulloa will be sentenced to the Court and sent a
considerable distance from his home.  The chance that he'll
have the ability to have familial contact is going be
substantially diminished which is not a punishment envisioned
in the guidelines but is a reality of the circumstances of
this particular jurisdiction.  And it's -- it is fairly
limited only to a small number of jurisdictions where this
circumstance occurs.  Even in Hawaii now, they have a prison
facility there and people who are from Hawaii are imprisoned
there so that they have close proximity to their loved ones.

          Unfortunately, for people who live in the
District of Guam and the District of Saipan and they don't
have that ability to have a close facility.  And the cost of
air travel is so expensive it is prohibitive of loved ones
being able to go and visit with people that they love and care
for.  It is the nurturing and love of family members which is
a very important part of the culture of the people who inhabit
Guam.  And it is that love and affection which in many
instances has helped to guide people down the proper road of
being a good and productive citizen.  Mr. Ulloa will have to

struggle without that ability.  As long as he is sentenced to

a period of greater than twelve months, he is able to be

provided educational services and job training.  A period of

87 months, even when the Court takes off the period of time

that he has served today and gives him credit for time served,

will still result in excess of four years of imprisonment that

he will serve, and so he will certainly have ample opportunity

to complete educational programs and job training within that

period of time.  So imposing a sentence upon him as

recommended by the guidelines is not going to deprive him of

the ability to participate in those programs.

            So again, one further concern mentioned by the

government is not an actual concern that won't be addressed by

a sentence imposed based upon the guidelines range.  I ask

Your Honor to sentence Mr. Ulloa to the 87 months.  It is what

he had hoped he would get and bargained for in the plea

agreement.  He promptly entered his pleas to the Court.  He

has accepted responsibility for his misdeeds, and I think that

the portion of the presentence report which addresses it shows

that he is extremely remorseful for his conduct.  Mr. Ulloa

had a very significant relationship between himself and

Ms. Duenas.  It is a very significant relationship to him,

probably the most significant relationship that he has had

outside of the relationship between him and his parents, which

has suffered as a result of this case.  He probably is going

1     to find that that relationship won't be able to be resurrected

2     when his term of imprisonment is concluded.  He wants to be

3     able to come back and participate in his children's lives, and

4     if the Court sentences him to the term envisioned by the

5     sentence guidelines, he will have an opportunity to do so.  He

6     will receive good time credit if he is a good inmate in the

7     federal system.  If he isn't, he will receive reduced good

8     time credits.  I believe that the law takes into consideration

9     the effect of imprisonment, how it will benefit a defendant by

10    the good time credits.

11            So I think that all of the issues that the

12    sentencing court is supposed to take into consideration under

13    Section 3553 are addressed by the sentencing guidelines in

14    this case and by the circumstances of this case, even more so

15    because of his lack of -- his inability to have familial

16    contact.

17            I ask the Court to recommend to the Bureau of

18    Prisons that Mr. Ulloa be sentenced and incarcerated in a

19    facility on the West Coast so that in the event that family

20    members are able to afford to fly to see him, it will be at

21    minimum of what it is and could cost to fly to somewhere else

22    to the United States to see him.  In any event, it will

23    certainly be a great cost, and that is my recommendation.

24    Thank you.

25            THE COURT:  All right.  Thank you.  Mr. Ulloa,

1  did you wish to address the Court before I pronounce

2  sentencing?  If you would come to the podium.  Stand in front

3  of the microphone.  Thank you.

4          THE DEFENDANT:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          THE DEFENDANT:  I come before you this day to

7  respectfully ask for mercy and leniency.  Before I begin, I

8  would like to say that though through my actions I may appear

9  as a bad person or father, I'm just the opposite.  I believe

10 I'm a good person with a good heart and a good, caring and

11 loving father.

12         During that time I happened to get involved with

13 the wrong crowd.  I recognize that my actions and my behavior

14 has made me a burden to society.  For the past 16 months I

15 have been incarcerated, I realize that I brought much pain and

16 suffering to the people I love, especially my children.  I

17 know that there is no one to blame for my incarceration except

18 myself.  I have been reckless, irresponsible, a poor member of

19 the community and a drug addict, but that's no excuse.  My

20 behavior, actions and troubled choices I made not only have

21 brought me down but everyone around me, most especially my

22 children.  I regret so much of these things I've done, I'm so

23 very ashamed of it and I am so deeply sorry for my actions and

24 behavior and it pains me in my heart every day.  I look back

25 and reflect on my life knowing that my children, who I'm so

very close with, has been without me for the past 16 months
and will continue to be without me for some more time that
lies ahead.  It's very unbearable; however, out of the good
comes the bad -- I mean, out of the bad comes the good.  I
have found a new relationship with God and a new relationship
with my family as well and I rely heavily on them both for
strength and guidance, gives me the will to move forward and
endure these trials and to face any obstacles that may come my
way.

On January 7, 2008, I hit the lowest point of my
life.  It was then when I realized my actions and behavior not
only jeopardized my life but the people I care and love.
Since then, each and every day I reevaluate myself and my life
and think of more ways for improvement.  I know I have been
wrong.  I want so much the opportunity to make it right;
giving back rather than taking.  I do take full responsibility
for my actions and I fully accept the consequences for them.
I believe it's the first step forward.  And I only desire --
only desire and continue in doing so to better myself and my
life.  I have no future plans or intentions on ever
endangering the welfare of my children, community or myself
again.  I do believe that within the past 16 months of
incarceration, it has been a huge reality check and a rude
awakening teaching me to cherish and appreciate to the fullest
just what my children and life has to offer and mean to me.  I

```
 1    want and desire so much with my heart to better myself and

 2    start fresh and new, becoming a whole new and better person

 3    for my children and family and society.  I humbly say again

 4    that I sincerely apologize with all my heart and soul for my

 5    actions and I respectfully ask and pray for mercy, forgiveness

 6    and leniency.  Thank you for your time.

 7              THE COURT:  Mr. Ulloa, the Court appreciates the

 8    statements of -- the statement that you have made.  It's not

 9    often that a defendant will come to the court and realize and

10    accept full responsibility of their actions at the time of

11    sentencing.  I mean fully accept responsibility.

12              As I reviewed this case and sentenced Christine

13    Duenas, the mother of your children, and looked at the other

14    defendants who are also involved, it's clear that you were the

15    head of the household of your children.  That was your home

16    with Christine Duenas.  And as the head of household, your

17    three children, who I believe are nine years old, five years

18    old and four years old at that time, approximately those ages,

19    those two other children, a teenager, you put them at serious

20    risk for, as you know, toxic inhalation, possibly -- and worse

21    yet, if they ever ingested the drugs that you and your

22    co-conspirators and co-defendants had manufactured at your

23    home, your children would have been at risk for death or even

24    serious injury.  And I think you know that.  You have

25    indicated that through your words today.  And that to me is a
```

1  very, very serious breach of your duty to your children.  It

2  seems to me that you understand that now.  You seem very

3  remorseful.  You have good family support.  That's good.  I

4  know that in a presentence report, your mother has taken

5  custody of the children; is that correct?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  So she still has custody of your

8  three kids?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Full custody.  So that's very

11  important that your kids are with your family.  But for

12  someone like yourself who had full custody, care and control

13  of your children and to put them at risk and have these drug

14  defendants, including yourself, manufacture drugs in your

15  home, I think, is probably the most serious breach of what you

16  have committed, in addition to having a firearm in your

17  possession.  And then the Court has looked at your criminal

18  history.  You're such a young man.  You have two prior records

19  and then you have, as I understand it, two pending cases that

20  have not been finalized over at the Superior Court.  So that

21  -- the Court also looks at that, your criminal history

22  category, then the Court looks at the extent of what was going

23  on in the -- in your home.  There were -- as you know it, you

24  saw the presentence report, there was -- I think the most

25  compelling piece of evidence against you, in terms of putting

your children at risk, was when the police arrived at the

home, your children were sleeping in the master bedroom and

there was an acetone can on the floor in that same room that

shows that you were reckless, and you've admitted that now

that you were reckless in endangering your children and these

other children who were there.

You know, the Court believes that the sentence

has to fit the crime.  The crime notes that the statement made

by Agent Churchin that you have -- you were given the

opportunity to cooperate and I suspect maybe you weren't

cooperating because you were still addicted -- I don't know

-- to the drugs, when you were given that initial opportunity.

The Court notes that with regard to your plea,

you have pled guilty to being a drug user in possession of a

firearm.  That's a .45 caliber pistol.  And you have pled

guilty to conspiring to manufacture a methamphetamine and I'm

also looking at the parody of sentencing between yourself,

Christine Duenas, the mother of your children, Jonathan Ninete

and then Johnnie Fortner who have already been sentenced by

the Court.  The Court believes after having heard the

statements of counsel for the prosecution, your attorney's

statements, your remorseful remarks, and after having read the

presentence report submitted by Probation, the Court believes

that you should be committed to the Bureau of Prisons for a

sentence of 87 months and the three years of supervised

release in criminal case 7-111 and 87 months imprisonment and
four years of supervised release for 08-13; both cases to be
served concurrently. The Court will order a $200 special
assessment for each count and that will be due immediately.
Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Due to your financial situation, the
fine will be waived. As I said, supervised release for a term
of three years for Count 1 under CR 7-111 and for four years
supervised release for Count 1 CR 8-13 will be served
concurrently and you must comply with the following
conditions:

You shall not commit another federal, state or
local crime. Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You must comply with the standard
conditions adopted by the Court. And you must not possess a
firearm or other dangerous weapon as defined by federal, state
or local law. Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You must cooperate in the collection
of a DNA sample as directed by U.S. Probation and you must not
use or possess illegal controlled substances, you must submit
to one urinalysis test within 15 days of release from custody
and to two or more urinalysis not to exceed eight tests per

month.  You must participate in a program approved by U.S.
Probation for substance abuse and the program shall include
testing to determine whether you have reverted to the use of
drugs or alcohol.  You must make a co-payment for the program
at a rate to be determined by U.S. Probation.  Do you
understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You shall perform 50 hours of
community service under the direction of U.S. Probation.  In
addition, the Court will refer you to the -- is it 500 hours
of intensive drug treatment program?

PROBATION OFFICER:  Yes.

THE COURT:  I will make a judicial recommendation
to the Bureau of Prisons that you will be placed in prison
that has that program and then I will make a judicial
recommendation that you be sentenced to a facility on the West
Coat that has that particular program.  I don't want -- and so
it could be California, Oregon, Washington, someplace along
the West Coast.  But if they don't find it -- if there's none
available, then they'll look someplace else but that will be
the judicial recommendation.

Is there anything else that I might be missing,
Mr. Guilliott?

PROBATION OFFICER:  We would just respectfully
request that no alcohol; no alcohol provision.

1          THE COURT:  All right.  The Court will also order

2   no alcohol.  Do you understand?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Since you have an alcohol problem

5   with your priors.  Okay.  The Court finds that the sentence

6   imposed today takes into consideration all the factors even

7   those set forth in 3553(a) and achieves the general purpose of

8   sentencing including the consideration of the advisory non

9   binding sentencing guidelines.

10          The Court also notes that this sentence meets the

11  objectives of punishment and deterrence.  You will be spending

12  seven years and -- 7.25 years away from your family.  I hope

13  that you -- at this point you sound very positive about your

14  rehabilitation, you sound like you're on the road to recovery,

15  you just have to keep that up if you really want to come back

16  and be a productive member of this community and see your

17  children again and be a father to your children.  I tell a lot

18  of defendants who come into my court, Mr. Ulloa, that it's

19  more important for their children to see their parents learn

20  from their mistakes and recover, and I'm sure all your

21  children are looking at you right now seeing how you handle

22  this.

23          In your plea agreement, you waived your right to

24  appeal your conviction, nevertheless you have the right to

25  appeal this sentence and judgment of this court.  Your notice

of appeal must be filed within ten days of entry of judgment.

If you're unable to pay the cost of an appeal, you may apply

to file a free appeal.  If you request, the clerk will prepare

and file a notice of appeal on your behalf.  I'm also advising

you that if you can't afford an attorney to handle your

appeal, one will be appointed to represent you.  Do you

understand?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  All right.  Prosecution, did you wish

to dismiss the other counts in the indictment?

        MS. SAN NICOLAS:  Thank you, Your Honor.  In

criminal case number 08-00013, we move to dismiss the

remaining counts, 2 and 3.

        THE COURT:  All right.  Very well.  So ordered.

All right.  Mr. Van de veld, any reason why this sentence as

stated should not be imposed?

        MR. VAN DE VELD:  No, Your Honor.  Did Your Honor

say credit for time served?

        THE COURT:  He will receive credit for time

served.  I don't think I said that but the Court will order

that you receive credit for time served.  And the Bureau of

Prisons, Mr. Ulloa, will calculate what exact time that is.

Do you have any questions?

        THE DEFENDANT:  No, Your Honor.

        THE COURT:  All right.  Good luck to you.

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  All right.  Very well.  Thank you.

3          MR. VAN DE VELD:  Your Honor, there is one

4    matter, and that is, the defendant would like to know if he

5    can be released to reside with his mother during the pendency

6    of the designation of facility subject to electronic

7    monitoring and drug testing.

8          THE COURT:  Prosecution?

9          MS. SAN NICOLAS:  We'd object, Your Honor.  The

10   reason, Your Honor, is that the defendant has been sentenced

11   by the Court, he faces substantial time.  It can be reasonably

12   presumed that this would give the defendant incentive to flee.

13   The case involved the defendant posing a danger to his

14   children, to the community.  We ask that the Court not release

15   this defendant pending a designation and we object to any

16   release, Your Honor.

17         THE COURT:  Mr. Guilliott?

18         PROBATION OFFICER:  We concur with the

19   government.

20         THE COURT:  All right.  The Court will deny the

21   request.  I will allow of course Mr. Ulloa to have access to

22   his family for visitation, but because you face a substantial

23   period of time, Mr. Ulloa, and because you not only endangered

24   your children when you were manufacturing ice but you also

25   endangered the neighbors who lived in -- around your home, so

1    the Court believes that it's more prudent that you wait until

2    the Bureau of Prisons has designated your time while you are

3    at the facility -- detention facility.  That will be the order

4    of the court.  Thank you.

5              MR. VAN DE VELD:  Thank you, Your Honor.

6              (Proceedings concluded at 11:17 a.m.)

7                          * * *

8         --------------------------------------------

9              CERTIFICATE OF REPORTER

10

11   CITY OF HAGATNA              )
                                  )  ss.
12   TERRITORY OF GUAM           )

13

14         I, Veronica F. Reilly, Official Court Reporter for

15   the District Court of Guam, do hereby certify the foregoing

16   pages 1 to 52, inclusive, to be a true and correct transcript

17   made of the digitally-recorded proceedings, to the best of my

18   ability, at the date and time therein set forth.

19         Dated this 29th day of May, 2012.

20

21                          /s/Veronica F. Reilly
                            Veronica F. Reilly
22

23

24

25